**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**


UNITED STATES OF AMERICA,

                Plaintiff,

v.                                    CRIMINAL ACTION NO. 2:09-cr-00064

JAMES R. THOMPSON,

                Defendant.


**MEMORANDUM OPINION AND ORDER**


Pending before the Court are Defendant James R. Thompson's Motion in Limine [Docket 15] and Motion to Suppress [Docket 16]. The United States responded to both motions, and the Court heard the parties regarding the motions on May 2, 2012, and June 4, 2012. (Dockets 22, 34.) For the reasons that follow, the Motion in Limine [Docket 15] is **DENIED AS MOOT** and the Motion to Suppress [Docket 16] is **DENIED**.

*I. BACKGROUND*

The facts known to the Court are derived from the testimony of three law enforcement officials: Detective Shawn Snuffer, Larry Dodson—who is a civilian employee, and K9 Officer Jason Elkins. All three men are employed for the Kanawha County Sheriff's Department, and were, at the time, assigned to or acting in conjunction with the Kanawha County Bureau of Investigation (KBI). Those facts are as follows.

*A.     The Anonymous Tip*

On February 20, 2009, Lawrence County, Kentucky, Sheriff Garrett Roberts contacted Lieutenant G.S. Young of the Kanawha County Sheriff's Office to report an anonymous tip he had received.   Sheriff Roberts stated the following information had been received via a telephone call with an anonymous caller: (1) the caller was in the company of James Thompson, whom Sheriff Roberts reported to be "a known narcotics dealer" in his jurisdiction, and Krystal Branham; (2) the caller and Thompson were driving to South Carolina or Florida to pick up a large quantity of prescription pills; (3) the individuals would be returning to Room 131 at the Motel 6 in Cross Lanes, West Virginia; (4) the caller was scared and did not want to return to the motel; (5) the party was driving an older model green Ford Mustang; (6) there were firearms with the party or in the motel room; and (7) James Thompson sometimes used the alias David Stafford.   Lieutenant Young then relayed the tip to officers with the Kanawha County Bureau of Investigation, who initiated surveillance on the Motel 6 in Cross Lanes, West Virginia.

*B.     February 20th Surveillance*

On February 20, 2009, KBI officers conducted surveillance on Room 131 of the Motel 6. They observed no people in Room 131, and they saw no green Ford Mustang.   When officers questioned a motel employee, however, they were advised that Room 131 was currently rented by Krystal Branham and that she was driving a green Ford Mustang.   Officers ceased surveillance around midnight.

*C.     February 21st Investigation*

The next morning, a motel employee contacted KBI Detective Don Scurlock and reported that a green Ford Mustang was present at the motel near the exterior of Room 131.   The employee

also stated that Krystal Branham was present, accompanied by two men, one of whom responded to "James." Based on the information from the motel employee, KBI detectives returned to the motel and observed a green Mustang parked immediately outside the open door to Room 131. The door to the room was wide open. They also observed three individuals carrying belongings and luggage from the motel room to the Mustang, apparently preparing to leave the motel. Shortly after their initial observations, at least four officers[1] decided to approach the group to inquire about prescription pills. When the officers approached, two of them engaged David Stafford outside the motel room in the parking lot. Two more officers approached the open doorway to the motel room, where they observed Krystal Branham in approximately the middle of the motel room living area. One of the officers who approached the motel room doorway was in uniform (Elkins), and one was not (Dodson). The officers verbally identified themselves and asked Ms. Branham if she would step outside so they could talk to her. Branham complied. As she exited the motel room, the officers asked her whether anyone else was in the room. Branham gave no answer, and she instead walked past the officers and out of the motel room.

At the same time, officers observed a partially open bathroom door close, ostensibly in response to their identifying themselves. The officers then entered the motel room to determine if anyone else was present. On the way to the bathroom, one of the officers noticed a box of .45 caliber ammunition on one of the beds. The officers knocked on the bathroom door and said "Sheriff's department, we need to speak with you." Defendant then opened the bathroom door. He was wet and naked, apparently from taking a bath. He stepped out of the bathroom and closed the door behind him. One officer directed Defendant to put on some clothes and sit on a bed,

---

[1] For the sake of ease and clarity, Larry Dodson is included in the Court's reference to "officers," although, as noted previously, he was a civilian employee with the Kanawha County Sheriff's Department.

while the other officer re-opened the bathroom door to make sure no one else was inside. The officer observed a handgun on the bathroom floor, and he alerted other officers to this fact. Defendant was then read his *Miranda* rights and briefly interviewed after he waived those rights. The motel room was secured while officers prepared to apply for a search warrant.

At the same time this was going on, officers outside the motel room frisked David Stafford for weapons. In the process, they recovered a number of hydrocodone pills, which Stafford volunteered were not legally possessed and had come from Defendant. Officers then applied for and obtained a search warrant for the room based on all of the foregoing information. They recovered several thousand hydrocodone pills in a grocery bag in the bathroom, as well as various other drugs and a firearm. After executing the search warrant, Detective Snuffer placed Defendant in the front seat of his patrol car and initiated a taped interview, at which time Defendant freely admitted possessing the pills.

An indictment was filed against Defendant Thompson on March 9, 2012, charging him with: (1) possession with intent to distribute Schedule III controlled substances in violation of 21 U.S.C. § 841(a)(1); (2) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A); and (3) possession of a firearm subsequent to a felony conviction in violation of 18 U.S.C. § 922(g)(1). On April 23, 2012, Defendant filed an omnibus Motion in Limine and a Motion to Suppress the pills, the firearm, and his incriminating statement as obtained in violation of the Fourth and Fifth Amendments to the United States Constitution.

## II. MOTION IN LIMINE

At the May 2, 2012 hearing, Defendant represented to the Court that the issues raised in his motion in limine were mooted by supplemental discovery and communication with the United

States, except for one. As to the remaining issue, Defendant argued that, pursuant to Rule 16 of the Federal Rules of Criminal Procedure and *Giglio v. United States*, 405 U.S. 150 (1972), the United States is required to provide him with error rates for the individual chemist and laboratory that analyzed the pills seized from the motel room. Defendant's motion seeks exclusion of the expert chemist at trial should the error rates not be produced. (Docket 15 at 7.) At the hearing, the United States stated that no error rates exist for either the chemist or the laboratory regarding this testing method. The Court directed the United States to produce such error rates or otherwise formally notify Defendant that no such information is available, whatever the case may be. The Motion in Limine [Docket 15] is therefore **DENIED AS MOOT**.

### III.  MOTION TO SUPPRESS

A.      *Fourth Amendment Argument*

In his motion to suppress, Defendant Thompson argues that the anonymous tip was not sufficiently reliable to permit officers to enter the motel room for safety purposes. (Docket 15 at 5.) In Defendant's view, the anonymous tip must have been reliable "in its assertion of illegality" in order to justify warrantless entry into the motel room. (*Id.*) In support of this assertion, Defendant cites *Florida v. J.L.*, 529 U.S. 266, 272 (2000).

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. There is little doubt that Defendant's Fourth Amendment rights extend to the motel room he occupied, *Stoner v. California*, 376 U.S. 483, 490 (1964) ("[A] guest in a [m]otel room is entitled to constitutional protection against unreasonable searches and seizures."), though his expectation of privacy is almost certainly diminished by leaving the motel room door wide open.

Nonetheless, even assuming Defendant enjoyed the full measure of the Fourth Amendment's protections, the officers' entry into the motel and subsequent actions to secure the area were reasonable under the circumstances, and therefore, the evidence will not be suppressed.

It is axiomatic that the Fourth Amendment prohibits only those searches and seizures which are unreasonable. *See Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1856 (2011) ("The ultimate touchstone of the Fourth Amendment is 'reasonableness.'") (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). A warrantless entry into an individual's residence is per se unreasonable unless the intrusion falls within one of the carefully defined exceptions to the warrant requirement. *Payton v. New York*, 445 U.S. 573, 586-89 (1980). One such exception to the warrant requirement occurs when the "'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Any warrantless search permitted by the exigent circumstances exception must be "strictly circumscribed" by the exigency that justifies the exception, and the search may not be expanded beyond what is necessary to allay the exigency without further justification. *See id.* at 393.

Courts recognize the existence of exigent circumstances to justify a warrantless search in several situations, including: to prevent the destruction of evidence, *Kentucky v. King*, 131 S. Ct. 1849; to ensure the safety of law enforcement officers or the general public, *United States v. Gwinn*, 219 F.3d 326, 331 (4th Cir. 2000) (drunk, armed man making threats); when police are in "hot pursuit" of a fleeing suspect, *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (pursuit of man from street into his home permissible); or other emergency circumstances exist, *Brigham*

*City*, 547 U.S. at 403 (need to assist injured individuals); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (burning building). The Fourth Circuit has plainly stated that the exigent circumstances exception to the warrant requirement "basically encompasses officer safety and the destruction of easily-disposed evidence." *Gould v. Davis*, 165 F.3d 265, 270-71 (4th Cir. 1998).

To successfully invoke the exigent circumstances doctrine, law enforcement officers need only possess a "reasonable suspicion" that such circumstances exist at the time of the search or seizure. *United States v. Grogins*, 163 F.3d 795, 797 (4th Cir. 1998). "Exigent circumstances render permissible a warrantless search or seizure, *even when there is no probable cause to believe that a crime has been committed.*" *Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002) (emphasis added) (citing *Michigan v. Tyler*, 436 U.S. at 509). The Fourth Circuit in *Figg* specifically stated that "[o]ne such [exigent] circumstance exists when police officers engaged in lawful investigatory functions would be endangered in the absence of a warrantless seizure." *Id.* (citing *Michigan v. Summers*, 452 U.S. 692, 702-03 & n.17 (1981)). Finally, in considering the existence and extent of an exigent circumstance after the fact, courts must not engage in "unreasonable second-guessing" of the officers' assessment of the circumstances they faced. *Montoya de Hernandez*, 473 U.S. at 542.

The appropriate inquiry in asking whether KBI officers' warrantless entry into Room 131 was lawful, therefore, is whether, considering the totality of the circumstances, officers had reasonable suspicion that their safety was in jeopardy such that immediate entry into Room 131 was required. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266 (2002) (reaffirming the "totality of the circumstances test"); *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008) (endorsing a "commonsense and contextual approach" and a "holistic" review in evaluating reasonable

suspicion).  Reasonable suspicion is "less demanding . . . than probable cause."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  In order to justify the warrantless entry in this case, the officers "must simply point to 'specific and articulable facts which, taken together with rational inferences from those facts,' evince more than an 'inchoate and unparticularized suspicion or hunch'" that their safety or the public safety was at risk.  *See Branch*, 537 F.3d at 336 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968)).[2]

The information available to officers at the time of the entry into Room 131 is more than sufficient to give rise to a reasonable suspicion that their safety was in jeopardy.  Defendant assails this conclusion by asserting that the anonymous tip was unreliable and uncorroborated in its assertion of illegality.  (Docket 16 at 4-5.)  In his view, the officers therefore were not permitted to rely on the tip's assertions in considering their safety during the encounter.  It is well established that "[i]n cases where an informant's tip supplies part of the basis for reasonable suspicion, [the court] must ensure that the tip possesses sufficient indicia of reliability."  *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004); *see also United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007) (same).  In the case of an anonymous tipster, the tip must be supported "by some corroborative elements that establish the tip's reliability."  *Perkins*, 363 F.3d at 323.  In assessing an anonymous tip's reliability, the district court must examine the totality of the circumstances.  *E.g.*, *United States v. Reaves*, 512 F.3d 123, 128 (4th Cir. 2008).  The court must endeavor to distinguish between those tips that contain detailed predictions of the target's future

---

[2] Some courts have required a showing akin to probable cause in order to justify warrantless entry pursuant to the officer safety exception.  *See, e.g.*, *United States v. Beaudoin*, 362 F.3d 60, 66 (1st Cir. 2004) (government must show "a reasonable basis, approximating probable cause," to believe exigency existed).  The Court is unaware of any similar case in the Fourth Circuit, and *Figg* adopts a far less stringent standard in considering an officer safety exigency.  *See* 312 F.3d at 639 ("For police officers successfully to assert the exigent circumstances doctrine, they need only possess a 'reasonable suspicion' that such circumstances exist at the time of the search or seizure in question.").

activities or otherwise indicate the tipster has inside information from those tips that merely assert criminal wrongdoing in a "bare bones" manner. *Compare, e.g.*, *Alabama v. White*, 496 U.S. 325, 331 (1990) ("[I]f an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity."), *and United States v. Bynum*, 293 F.3d 192, 206 (4th Cir. 2002) (Michael, J., dissenting) ("[P]artial corroboration of an informant's tip supports the reliability of the tip's unverified allegations of criminal activity to the extent that the corroboration shows that the informant has inside information about the subject of the tip."), *with J.L.*, 529 U.S. at 271 (police improperly relied on "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]").

It is beyond question that "[a]n anonymous telephone tip that alleges illegal [conduct] but that merely identifies a suspect and his location does not itself provide reasonable suspicion." *United States v. Brown*, 401 F.3d 588, 596 (4th Cir. 2005) (citing *J.L.*, 529 U.S. at 271-72). This is the teaching of *J.L.*, where the Supreme Court held insufficiently corroborated an anonymous tip that reported a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. *See* 529 U.S. at 268. In contrast, in *Alabama v. White*, the Supreme Court upheld a traffic stop based on predictive information contained in an anonymous call, namely that a woman named Vanessa White would be leaving a certain apartment at a particular time, traveling to a particular motel in a particular car with a broken taillight, and that she would be carrying an ounce of cocaine in a brown attaché case. 496 U.S. at 327. Police observed a woman exit the apartment at the stated time and enter a car matching the description given, all while carrying a

brown attaché case.   Police stopped the woman just short of the destination motel, where she was discovered in possession of a large quantity of cocaine   *Id.*

The situation in this case is much closer to *White* than to *J.L.*   As in *White*, the informant in this case identified Defendant and one of his companions, Krystal Branham, by their full names. The informant also supplied the name of the third individual, David Stafford, though the tip indicated that the name was sometimes used as an alias by Defendant.   Names aside, the tip correctly conveyed that there were three individuals in the group.   The informant gave a description of the group's vehicle, stating it was an older-model green Ford Mustang.   The tip also contained a great deal of predictive information.   The informant stated that the group would be arriving at Room 131 of the Motel 6 in Cross Lanes, West Virginia, at a date later than February 20, 2009, when the tip was received.   This nuance is important: that the group was absent from the Motel 6 on February 20, 2009, is actually corroborative of the tip's reliability, especially when coupled with their appearance in Room 131 the next day.   The informant further reported that the room would be registered in the name of Krystal Branham.   This information was verified by KBI officers, who interviewed a motel employee and confirmed that Room 131 was unoccupied on February 20th but registered to Krystal Branham.   Above any other fact, the informant's knowledge that Room 131 was registered *to Ms. Branham* indicates to the Court, as it must have to the officers, that the informant possessed inside information to which few others could be privy. Officers corroborated every aspect of the tip, including its predictive information, with the exception of the group's point of origin[3] (since officers arrived after the group on February 21) and the tip's assertion of illegal conduct.   Contrary to Defendant's view, the lack of corroboration

_____

[3] Defendant makes much of an apparent discrepancy between the officers' testimony and the search warrant affidavit about whether the group was arriving from Florida or South Carolina.   Since the officers were never able to verify the group's point of origin, or even their direction of approach, this argument is largely irrelevant.

of the illegal aspects of the tip is not fatal; instead, precedent establishes that corroboration of predictive information tending to show that the tipster has "insider information" will suffice as proof of the tip's overall reliability.[4]   As such, officers were justified in relying, at the very least, on the tip's assertion that one or more firearms were present in Room 131 or amongst the group.

Having determined that the tip was suitably corroborated to permit officers to rely upon it in assessing the situation and, in particular, the existence of an officer safety issue in and around Room 131, the Court turns to the additional observations of the officers.   Prior to approaching the motel room, officers observed three individuals loading the Mustang.   The officers therefore knew that at least three people were in the motel room when they approached.   Mr. Dodson testified at the hearing that as he and Officer Elkins approached the open door to Room 131, they identified themselves, and then asked Krystal Branham to exit the motel room living area.   Ms. Branham complied, but she ignored the officers' query of whether anyone else was present in the motel room, and instead silently walked past the officers.   Officers also observed the bathroom door, which had been left ajar, swing closed as they announced their presence and directed Ms. Branham to exit the room.   It is undisputed that the officers were on the scene in response to a tip that one or more firearms was present in Room 131, along with at least one additional individual and a large quantity of illegally possessed prescription pills.   Rather than responding to the officers' announcement and questioning, the individuals in and around Room 131 endeavored to conceal their activities from police—by refusing to communicate with the officers and by hiding in the bathroom.   Although the individuals in Room 131 were free to remain silent and refuse to cooperate, those facts are rational considerations in the officers' assessment of their safety under

---

[4]  It is also worthwhile to highlight that the informant flatly stated that he was an insider, that he was travelling with Defendant to obtain a large quantity of pills, and that he was scared and did not wish to return to West Virginia.

the circumstances, and the Court appropriately considers Defendant's and Ms. Branham's evasive actions in the exigent circumstances analysis.

In sum, officers were lawfully present outside the motel room investigating the tip they had received the day before. They were entitled to conduct that investigation in a reasonably safe environment, and the minimal intrusion into the motel room to secure the additional person or people in the bathroom, quite possibly armed and hiding, was a measured and proportionate response to the safety concern the officers perceived, based on the totality of the circumstances. The Court concludes that the situation in and around Room 131 immediately prior to the officers' entry would prompt a reasonable officer to believe the situation to be dangerous, such that the exigent circumstance justified the cursory search of the motel room bathroom to secure the additional individual or individuals clearly therein.[5] Because Defendant closed the bathroom door behind him upon exiting, the officers were equally justified in conducting a cursory sweep of the bathroom to ensure no additional individuals were hiding there. It is upon re-opening the bathroom door that officers discovered a semi-automatic pistol laying on a towel in the middle of the bathroom floor. The re-entry into the bathroom was justified by the same officer safety exigency that prompted officers to enter Room 131 and approach the bathroom in the first place. Defendant deliberately closing the door behind him likely piqued officers' suspicions, including a reasonable belief that another individual may be concealed in the bathroom.

Even had officers not been justified in re-opening the bathroom door, the pistol inevitably would have been discovered upon execution of the search warrant. Under the "inevitable discovery" doctrine, improperly seized evidence may nevertheless be admitted "[i]f the

---

[5] Of course, had the evidence been discovered while, for example, officers searched dresser drawers or under bed mattresses, the search would not be reasonably tailored to the exigency, and the evidence and subsequent search warrant probably would be fatally flawed.

prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "[W]here it appears that evidence 'inevitably would have been discovered by lawful means,' the deterrence rationale of the exclusionary rule has 'so little basis' that the rule should not be applied." *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987) (quoting *Nix*, 467 U.S. at 444). Assuming the re-entry into the bathroom was improper, the pistol inevitably would have been discovered upon execution of the search warrant, which was adequately supported by probable cause based on the officers' observations up to the point of re-entering the bathroom. In other words, even after excising from the search warrant application all mention of the pistol, the warrant is still supported by substantial evidence of probable cause. The warrantless re-entry into the bathroom is, therefore, legally insignificant. Officers would have discovered all evidence in the bathroom pursuant to undoubtedly legal means approximately two hours later. The motion to suppress is **DENIED** on this ground.

To the extent Defendant's challenge goes beyond the propriety of the initial entry into Room 131, and additionally challenges the sufficiency of the search warrant, the motion is likewise **DENIED**. The rationale for this additional ruling is apparent: while getting Defendant out of the bathroom, officers observed a box of .45 caliber ammunition on one of the beds and "several unidentified pills lying [around] the room." (Docket 20-1 at 4.) The plain view doctrine permits the inclusion of such facts in the search warrant application. *See, e.g.*, *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir 1997) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). These facts, taken in conjunction with the contents of the anonymous tip, all of which are detailed with sufficient particularity in the search warrant affidavit presented to the magistrate

court, constitute substantial evidence to support probable cause for the search warrant.[6]  *See*

*United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (once issued, probable cause

determination in search warrant is to be shown "great deference"); *accord Massachusetts v. Upton*,

466 U.S. 727, 728 (1984) ("[T]he task of reviewing court is not to conduct a de novo determination

of probable cause, but only to determine whether there is substantial evidence in the record

supporting the magistrate's decision to issue to warrant.").

*B.      Fifth Amendment Argument*

Defendant also contends that his taped admission of guilt was obtained in violation of the

Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966).   (Docket 16 at 7-8.)   The facts

relevant to the challenge are as follows.   After Defendant was removed from the bathroom to the

living area of Room 131, Detective Snuffer advised Defendant of his *Miranda* rights, and he

explained that Defendant was under no obligation to cooperate with police.   (Docket 20 at 4.)

Defendant then provided an unrecorded statement to Detective Snuffer, in which he indicated his

---

[6]  The Court also notes that, although the United States offered no testimony of the incident, the government's briefing and the search warrant application indicate that a pat down frisk of David Stafford conducted contemporaneously with the entry into Room 131 yielded a quantity of hydrocodone pills.   Mr. Stafford indicated that the pills were illegally possessed and that he obtained the pills from Defendant.   This series of events would provide officers probable cause to enter Room 131 without a warrant, and, because the incident was spelled out in the search warrant affidavit, it bolsters the propriety of the search warrant's issuance.

Furthermore, the probable cause independently derived from the incident is very likely an alternate theory of applying the inevitable discovery doctrine to this case, although the government chose not to pursue such a theory. The Fourth Circuit has expressly stated that "[t]he [inevitable discovery] doctrine also may apply where the facts indicate another search inevitably would have occurred and would inevitably have uncovered the evidence, and that search falls within an exception to the warrant requirement."   *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998) (citing *United States v. George*, 971 F.2d 1113, 1121-22 (4th Cir. 1992) (inventory search); *United States v. Cotnam*, 88 F.3d 487, 496 (7th Cir. 1996) (search incident to arrest)).   Entirely independent of anything observed in the motel room, Mr. Stafford's immediate admissions that his possession was unlawful and that Defendant was the source of the pills provided officers with probable cause to believe that contraband (and likely a firearm) was present in the motel room.   At that time, officers would inevitably have entered the motel room to make a warrantless arrest and to ensure that evidence was not being destroyed, and they would have discovered the pistol at that time.   *See Illinois v. Gates*, 462 U.S. 213, 230-31 (1983) (warrantless arrest permissible where officers have probable cause to believe a felony is being or has been committed); *see also Cupp v. Murphy*, 412 U.S. 291, 294-96 (1973) (warrantless search permissible when officers have probable cause and believe evidence is in imminent danger of destruction).

participation in a pill-trafficking scheme.  Detective Snuffer left the scene to prepare the search warrant application, received the search warrant from magistrate court, and returned to the scene to execute the warrant.  After the warrant was executed, Detective Snuffer placed Defendant in the passenger seat of his police cruiser and commenced a recorded interview without re-reading or reminding Defendant of his *Miranda* rights.  Again, Defendant cooperated with Detective Snuffer and willingly answered the questions posed to him.  At the hearing, Detective Snuffer estimated that two hours elapsed between the officers' entry into Room 131 and his recorded interview with Defendant.

*Miranda v. Arizona* requires that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney."  384 U.S. at 444.  *Miranda* warnings are required only if a subject is interrogated while in custody.  *See Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (whether person is "in custody" depends on whether, under the totality of the circumstances, a "suspect's freedom of action is curtailed to a degree associated with formal arrest.").  Once properly advised of his rights, an accused may waive them voluntarily, knowingly, and intelligently. *See Miranda*, 384 U.S. at 475.  A valid waiver of *Miranda* rights depends upon the totality of the circumstances, including the background, experience, and conduct of the defendant.  *See United States v. Hicks*, 748 F.2d 854, 859 (4th Cir. 1984).  A defendant's willingness to answer questions after acknowledging he understands his *Miranda* rights constitutes an implied waiver of those rights. *United States v. Cardwell*, 433 F.3d 378, 389-90 (4th Cir. 2005).

The United States properly concedes that Defendant was "in custody" at the time he gave both incriminating statements to Detective Snuffer. (Docket 20 at 13.) However, the United States contends that the warnings given prior to Defendant's initial interview, which took place in the living area of Room 131, and the contemporaneous implied waiver of those rights, are sufficient as to the subsequent recorded interview as well. (*Id.*) It is Defendant's position, in response to the government, that officers were required to re-advise Defendant of his *Miranda* rights before commencing the second, taped interview in Detective Snuffer's patrol car. This position is in tension with analogous case law. The Fourth Circuit in *United States v. Frankson*, 83 F.3d 79, 83 (4th Cir. 1996), held that the passage of two and one-half hours between the issuance of the *Miranda* warnings and the defendant's confession did not compromise the validity of the warnings. The defendant in *Frankson* was read his *Miranda* rights, but not interrogated for nearly three hours, at which time he confessed to authorities. *Id.* The present case is distinguishable from *Frankson* only in that Defendant immediately waived his *Miranda* rights and then continued to waive those rights two hours later. The rationale of *Frankson*—that the defendant's confession remained knowing and voluntary despite the lapse of time and his remaining silent for two and one-half hours—applies with equal force to the facts at hand. Defendant's confessions were given with the benefit of *Miranda* warnings, and neither the intervening time nor the intervening interview operates to dilute the knowing and voluntary nature of the second confession.

The Court readily acknowledges that *Miranda* warnings are not unlimited in their efficacy and perpetuity. Rather, "[t]here may be occasions where interrogation by one authority, be it state or federal, is so disconnected with interrogation by [another authority] as to compel a reiteration of

the *Miranda* warnings." *United States v. Hopkins*, 433 F.2d 1041, 1045 (5th Cir. 1970) (cited

favorably in *Wright v. North Carolina*, 483 F.2d 405, 406 n.4 (4th Cir. 1973)); *accord United

States v. Nordling*, 804 F.2d 1466, 1471 (9th Cir. 1986) (subsequent *Miranda* warnings not

required where different police agencies investigating different crimes conducted separate

interviews, separated by approximately fifteen minutes).   Here, Defendant was re-interviewed by

the same detective acting on behalf of the same law enforcement agency concerning the same

criminal activity.   The interviews were close in time and conducted in close proximity to one

another, although the second interview was recorded and conducted in a patrol car.   The

interviews are not so disconnected that second *Miranda* warnings were required.   *Cf. United

States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) ("*Miranda* . . . does not necessarily require that

a suspect be warned anew each time he is questioned."); *Guam v. Dela Pena*, 72 F.3d 767, 769 (9th

Cir. 1995) ("A rewarning is not required simply because there is a break in questioning.").   In that

vein, the Court now employs the test adopted by the Third Circuit in *Pruden* for resolving the

question of whether a suspect must be re-warned, by asking:

> (1) At the time the *Miranda* warnings were provided, did the defendant know and
> understand his rights?
> (2) Did anything occur between the warnings and the statement, whether the
> passage of time or other intervening event, which rendered the defendant unable to
> consider fully and properly the effect of an exercise or waiver of those rights before
> making a statement to law enforcement officers?

398 F.3d at 246-47.   Defendant was aware of his rights, he voluntarily and intelligently waived

those rights, and there is no evidence of any circumstance (including lapse of time) that would

have rendered Defendant unable to fully consider his rights prior to the second interview.   The

motion to suppress must be **DENIED**.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion in Limine [Docket 15] is **DENIED AS MOOT,** and his Motion to Suppress [Docket 16] is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        June 22, 2012

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE